## Reed v. Commonwealth.

(Decided May 20, 1938.)

608

A. T. W. MANNING and F. P. STIVERS for appellant.

HUBERT MEREDITH, Attorney General, and W. OWEN KELLER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

Appellant, his brothers Joe and Ches Reed, were indicted for the murder of Ernest Ledford. In the first count they were charged with the murder in further-

ance of a conspiracy to commit the offense; other and separate counts charged the overt act to have been committed by one of the three, with the others present aiding and abetting.

Appellant alone was called to trial, following a motion for severance and election, with the result that the jury found him guilty of murder, fixing the penalty at confinement in the penitentiary for life.

As is unusual in cases of this character, it is not contended that there was lack of evidence to take the case to the jury, or that the verdict is flagrantly against the evidence, though it is urged that the finding of guilt, followed by the infliction of a severe penalty, was due to bias and prejudice, particularly on the part of some members of the jury. It is also contended that the instructions, in certain respects, were confused, misleading, and prejudicially erroneous.

The homicide occurred on March 13, 1937, at Elbert Roark's home, where quite a number of persons, including Ledford and the three Reed boys, had gathered. The chief prosecuting witness said the homicide occurred in the following manner: When witness, along with Sharpe and others, got to Roark's home, the three accused, with Eugene Powell and deceased, were "all standing up close together in the front yard." Without detailing what had preceded the showing of a pistol, witness says that some one of the Reeds, or those with them, asked Ledford to show them his pistol, and he reached and got it and handed it to Ches or Joe, and appellant said, "Let me look at it," and he took the pistol and began shooting, "as fast as he could shoot."

Witnesses for the commonwealth say that Ledford was not doing anything which would provoke an encounter. Persons who prepared Ledford's body for burial testified that he was shot at close range, some six or seven times, some in the back toward the right side, one over the right hip, one over the left hip, and one under the right shoulder blade. The witnesses could give no idea as to whether or not the wounds were made by various sized bullets, but it appears from the proof that the pistol which Reed was using, whether his or Ledford's, was a 38-calibre.

After the shooting appellant ran around the corner of the house, and there was more shooting; some five or

six shots were fired. Witnesses thought that in the first shooting, in which Ledford was mortally wounded, there were perhaps ten or more shots fired. The chief witness being asked who fired the shots said: "Jim Reed done part of it." He did not know who "did the rest," but they were all "standing pretty close to the corner of the house." The first firing of pistols was very rapid, and witness did not think that appellant or any one had time to reload. Witness was quite certain that Ledford had no pistol save the one he handed to one of the Reeds.

John D. Sharpe says he had started back to the house after a meeting at the coal house. He had his back to the other parties; heard a shot and turned and saw Jim Reed shoot Ledford. He told Levi Sharpe that Jim had killed Ledford; Jim and Sharpe exchanged several shots. This occurred after Ledford had fallen over a rock wall. Witness could not tell whether any one shot at Ledford except Jim Reed; "they were coming fast." He says Ledford was sober, and Jim Reed was drinking. He had not seen or heard of any previous trouble.

The foregoing fairly represents the testimony for the prosecution, one conflict appearing wherein a commonwealth's witness states that Reed shot Ledford with his, Reed's, pistol.

Appellant admits that he shot Ledford but with his own pistol, and to protect his life. In detailing his part in the homicide he says he had been to Pleas Reed's on that morning; he started over to Ches Reed's and on the way stopped at Joe's and did not find him at home. When he arrived Chester was ungearing his team, and told appellant to go on to Roark's, and he would come by and they would go home. When he got to Roark's he found Joe Reed there. After a while, Powell, the two Spurlocks, and Levi Sharpe came up. Appellant went in the house, and later Joe and Ches came in. Ledford was present and had a quart jar of liquor from which he drank and offered others a drink. Powell pulled a pint bottle out of his pocket and Ledford said: "Put that back in your pocket and drink with the worst G. D. man in the house." At this point Ches said, "Jim let's go home," and they started to go. They had gotten off the steps of the house, and Ledford jumped to one side and said, "Jim Reed what in the

hell are you doing here?'' and "came out with his pistol, and throwed it in my breast, and I jerked mine from my left side and he shot me there in the left leg, and I came around with my left hand and shot him. He shot me in the leg because I knocked his pistol down.'' Ledford came up with his pistol again and pointed it in his face. Appellant emptied his pistol (six shots) after Ledford had fired his second shot. He denies that any of the Reeds asked for Ledford's pistol, or that he handed it to one or the other, or that he finally got it and shot Ledford. He denies that there was any pre-arrangement with Joe, Ches or any one else, to shoot Ledford. He says that after the shooting Levi Sharpe shot at him two or three times but did not hit him.

On cross-examination witness was asked to produce his pistol, but was unable to do so. He said he had "traded it off,'' two or three weeks after the homicide. Joe testifies to very much the same effect as did appellant, and adds that Roark had asked the crowd to leave because they were drinking. He says neither he nor Ches had a pistol, hence did not fire a shot, and that the only shooting at the time Ledford was killed was done by Ledford and appellant. Neither he nor Ches asked Ledford for his pistol, and appellant shot with his own pistol. He knew of no trouble or hard feelings between any of the Reeds and Ledford. Chester Reed follows very closely the testimony of Joe, and they both say Ledford was drunk at the time, and he and Jim and Ches were sober.

Several witnesses testified that they saw Ledford coming up the road about 3 o'clock in the afternoon before the shooting. He was drunk, cursing, and demanding the whole road for himself. It was also testified that he had a reputation for being quarrelsome and dangerous when drinking. One witness said he had heard Ledford say he was going to kill Reed. There was also some evidence tending to show that Powell, one of the commonwealth's witnesses, got Ledford's pistol after the shooting, the inference being that he did so to bolster the claim that appellant shot Ledford with his (Ledford's) pistol.

The foregoing is a fair detail of the testimony adduced on the trial, and the sharp conflict in the testimony is about as marked as in any case we have had for review. It is so conflicting as to cause appellant in

brief to say that if the prosecuting witnesses are to be believed, there is established an unprovoked murder. On the other hand, if defense witnesses are telling the truth appellant has established a complete self-defense, and we agree.

However, we are brought to a discussion of the two points ably argued by counsel in an endeavor to show reversible error. There were among the number finally selected as jurors, Toleman Brown and Taylor Keith. It was set out in motion for a new trial that both were "near relatives" of deceased, which fact was unknown to appellant and his counsel at the time he accepted the jury. In support of his motion appellant filed the affidavits of several persons, one to the effect that the mother of Brown, a juror, and Ledford's mother, were first cousins, hence the juror and deceased were second cousins. Another stated that there existed between juror Keith and deceased the same relationship as between juror Brown and deceased. One other affidavit corroborated the other two in respect to the kinship of both jurors to appellant. However, both jurors filed affidavits to the effect that neither knew of the alleged kinship at the time of their selection, and not until affidavit was filed. Both stated that they considered the case solely on the evidence introduced.

It is noted from the record that neither appellant nor counsel filed affidavit in support of this ground, to the effect that neither appellant nor counsel knew of, nor by the exercise of diligence, could have discovered the alleged relationship. In the case of Black v. Com., 154 Ky. 144, 156 S. W. 1043, we said (page 1045):

"These affidavits were filed in support of one of the grounds relied on for a new trial, but the affiants did not state when they first informed appellant or his counsel of the information they had concerning Boswell, nor do we find in the record any affidavit by appellant or his counsel relating when they were first advised by these affiants what Boswell said.

"When a new trial is asked on the ground that a juror has been guilty of misconduct, the person seeking a new trial on this ground should do so at the earliest moment after he has received information of the misconduct complained of, and should file his affidavit stating when he obtained the infor-

mation. If the party seeking a new trial on this ground fails to do this, he will be deemed to have waived his right to rely on the misconduct as a ground for a new trial after there has been a verdict against him. * * * Drake v. Drake, 107 Ky. 32, 52 S. W. 846, 21 Ky. Law Rep. 636.''

See, also, Pierce v. Com., 215 Ky. 162, 284 S. W. 1035, and cases cited; Caudill v. Com., 217 Ky. 403, 289 S. W. 371; Belcher v. Com., 247 Ky. 831, 57 S. W. (2d) 988.

We have also held that in a case where it is shown that relationship existed between juror and accused, and the juror is ignorant of the existence of kinship, he stands toward the accused as "an entire stranger, in so far as the affinity of blood might affect his verdict. It is the knowledge of the kinship and the feeling that arises from it that works the disqualification; and, if the knowledge is absent, the disqualification disappears.'' Miracle v. Com., 148 Ky. 453, 146 S. W. 1136, 1140. It is admitted by appellant that this rule, and the reasoning upon which it is based, has been followed in Crum v. Com., 209 Ky. 823, 273 S. W. 520, 521; Wyatt v. Com., 255 Ky. 545, 74 S. W. (2d) 928, 929; Sizemore v. Com., 210 Ky. 637, 276 S. W. 524.

Counsel compares the Miracle Case with Murphy v. Com., 221 Ky. 217, 298 S. W. 671, which we reversed on the ground that a juror testified that he had "forgotten'' that he was a member of the grand jury indicting Murphy, and had forgotten the facts as adduced before the grand jury, which facts he did not disclose on voir dire. It is argued that the ruling in the Murphy Case should be applied in this case, which, should it be done, would have the effect of overruling the Miracle Case on this point. The Murphy Case was written prior to many cases citing the Miracle Case, and no doubt the court's attention was directed to that case.

In Gray v. Com., 247 Ky. 282, 57 S. W. (2d) 6, we found error because a juror had sat through trial without disclosing that he was a first cousin of the father of the accused. But in that case there was no statement to the effect that if related, the juror was ignorant of that fact at the time he qualified, or during his service as such juror. The same situation existed in Miller v. Com., 203 Ky. 437, 262 S. W. 579.

Appellant complains of some of the instructions

given by the court, mainly because "badly drawn and in confused form." Instruction No. 1, the chief instruction, is criticized because in the first paragraph the court advises the jury under what circumstances it might find from the evidence beyond a reasonable doubt the defendant guilty, either as principal or in aiding and abetting in the homicide. Two separate paragraphs, beginning with the word "guilty," advise the jurors under what circumstances they may fix the degree of guilt, that is, murder or voluntary manslaughter. It is argued that the court, by his arrangement of the three instructions into one, confused the jury, and the word "guilty" carried too much emphasis. It is not seriously argued that the instruction as given would authorize us to hold its giving in the form, a reversible error, and we agree on this point.

However, it is argued that the "triple" instruction was not negatived by embracing therein the right of appellant to defend himself, which right as to accused was carefully preserved to him in Instruction No. 3 in due form, and not subject to criticism.

The argument is fully answered by reference to Johnson v. Com., 266 Ky. 224, 98 S. W. (2d) 492; Bourne v. Com., 234 Ky. 842, 29 S. W. (2d) 561. We find no serious error with the form of the instruction. We can see no reason why a juror of ordinary understanding would have difficulty in ascertaining precisely what the court was intending to, and did convey to the minds of the jurors. See Lambdin v. Com., 255 Ky. 438, 74 S. W. (2d) 930.

It is further urged that the instructions were erroneous, because in the combined instruction on murder and manslaughter the court assumes the guilt of defendant. The instruction, or so much as is attacked, reads:

"Guilty of wilful murder, if you shall believe from the evidence beyond a reasonable doubt, that such shooting, wounding and killing, or such aiding and abetting, assisting * * * was done with malice aforethought."

The same vice is attributed to the instruction on manslaughter, the objection being urged as to the use of the word "killing," and "aiding," etc., since it is argued that the court assumed, and so told the jury,

that a killing was perpetrated, and there was aiding and abetting.

The objection is untenable. It must be recalled that appellant admitted that he shot and wounded Ledford. He was not certain that his shots were fatal, but this fact was established beyond doubt. The question of whether appellant was aiding and abetting was in conflict, if the testimony of appellant is observed. As to the first part of the objection there is no room for doubt as to the correctness of the instruction. It is noted that in Hobson and Calwell's Instructions, the one here criticized is given in form. It is true that in the approved form the words "wounding" and "killing" are not included. The word "shooting" is used. It is also noted that the words "if you believe from the evidence beyond a reasonable doubt" are only used in the form at its beginning. Here the words are used both in the beginning and are repeated in both succeeding grammatical paragraphs, as was done in Ball v. Com., 125 Ky. 601, 101 S. W. 956, 31 Ky. Law Rep. 188, and in Burns v. Com., 136 Ky. 468, 124 S. W. 409, in each of which cases the form and substance, as here given, were not disapproved.

We find that there was sufficient evidence upon which to predicate an aiding and abetting instruction. Since we have recited in some detail the evidence, mainly for the purpose of illustrating the sufficiency of the evidence in this particular, we need not repeat. The facts as detailed, in connection with others not necessary to add, justified the court in determining that there was proof of an aiding and abetting. In the first part of instruction No. 1 the court told the jury under what facts and circumstances they might find appellant guilty if he actually committed the homicide or was present, aiding and abetting. There is proof that one or the other of the codefendants sought to obtain Ledford's pistol, and when about to be handed over, appellant took possession of it and fired. There had been ample time, and some movement on the part of all three accused, and perhaps others, to justify the belief that there was a preconcerted plan. Certainly enough proof to authorize the aiding and abetting instruction.

Under this state of facts we are led to the conclusion, not only that the instruction was a proper one, but that it was given in proper form. In the first part

of the instruction in which the court correctly laid the law as to what constitutes aiding or abetting, he told the jury such facts must be believed beyond a reasonable doubt, before they could find appellant guilty of any offense, of course correctly telling the jury its duty if appellant was principal in the homicide. In the following paragraphs (murder and manslaughter) he tells the jury how they should apply the aiding and abetting instruction in fixing the degree, and refers to the first part of the instruction as follows:

"If you believe from the evidence that such shooting, wounding and killing, or such aiding and abetting was done with malice or in sudden passion."

The instruction here given is readily distinguishable from such as the court rejected in Caudill v. Com., 220 Ky. 191, 294 S. W. 1042; Yarbrough v. Com., 219 Ky. 319, 292 S. W. 806; Barker v. Com., 209 Ky. 817, 273 S. W. 503. As to the sufficiency of the evidence to warrant the giving of the instruction, reference may be had to Conn v. Com., 245 Ky. 583, 53 S. W. (2d) 931; Luttrell v. Com., 250 Ky. 334, 63 S. W. (2d) 292; Vanover v. Com., 246 Ky. 32, 54 S. W. (2d) 375. The rule is that the whole of the instructions must be read together. Underwood v. Com., 266 Ky. 613, 99 S. W. (2d) 467.

Under the facts there was only one real issue in this case. There was not only ample proof, but tacit admission by accused that he fired the shot which took the life of deceased. This leaves open only the question as to whether or not the action is excusable because committed in self-defense. His admission made it incumbent upon him to satisfy the jury by proof that his act was excusable, under all the facts and circumstances. His success or failure in this particular is, and has always been under our repeated decisions in similar cases, a matter peculiarly for the consideration and determination of the jury. Simmons v. Com., 207 Ky. 570, 269 S. W. 732; Lickliter v. Com., 255 Ky. 471, 74 S. W. (2d) 918; Parker v. Com., 245 Ky. 623, 54 S. W. (2d) 21; Kirk v. Com., 247 Ky. 666, 57 S. W. (2d) 658. This rule prevails, with the exception, always, that if the evidence clearly and convincingly shows that the act was in self-defense, the court has the power and it is his duty to give a peremptory for the accused. Privitt v. Com., 271 Ky. 665, 113 S. W. (2d) 49.

Upon the whole case we are of the opinion that accused received a fair trial, and that the jury's verdict should stand.

Judgment affirmed.